### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KEISHA JONES,<br><br>                  Plaintiff,<br><br>          v.<br><br>DISTRICT OF COLUMBIA,<br><br>                  Defendant. | Civil Action No. 23-1488<br><br>Judge Beryl A. Howell |

### MEMORANDUM OPINION

Plaintiff Keisha Jones initiated this suit against her former employer, the District of Columbia ("District"), alleging, in ten counts, racial, gender, and disability discrimination and retaliation, in violation of both federal and local laws, including 42 U.S.C. §§ 1981, 1983, Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act of 1967 ("ADA"), 42 U.S.C. §§ 126, 12101 *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.  See, generally*, Compl., ECF No. 1.  Pending before the Court are two motions: defendant seeks dismissal of each of plaintiff's claims on various grounds, or, in the alternative, partial summary judgment on plaintiff's DCHRA gender and disability retaliation claims, in Counts VI and VIII, Def.'s Mot. to Dismiss or for Partial Summ. J. ("Def.'s Mot.") at 1, ECF No. 8, and plaintiff seeks discovery, under Federal Rule of Civil Procedure 56(d), before resolution of the alternative summary judgment motion, Pl.'s Mot. Pursuant to Rule 56(d) to Seek Discovery to Properly Respond to Def.'s Mot. for Summ. J. ("Pl.'s Discovery Mot.") at 1, ECF No. 13.  For the reasons discussed below, defendant's motion is granted in part and denied in part, with plaintiff's claims in Counts I, II, V, VII, and IX dismissed, and this case proceeding with only the claims of gender discrimination and retaliation, under Title VII and the DCHRA, in Counts III, IV, and VI, and

disability retaliation and failure to accommodate, under the DCHRA, in Counts VIII and X. Plaintiff's motion for discovery is denied as moot.

## I.    BACKGROUND

The factual background and procedural history of the instant matter are summarized below.

### A.    Factual Background

Plaintiff, an African American female, was employed at the Washington D.C. Metropolitan Police Department ("MPD") for approximately seventeen years, between 2006 to March 21, 2023, when she was terminated.  Compl., Introduction at 1–2, ¶ 49.  In 2006, she was hired as a district property technician at the General Schedule ("GS") six level, *id.* ¶ 1, until several years later, when she received a GS-7 grade increase, *id*. ¶ 6.  After she was denied a promotion to Lead Property Technician, plaintiff engaged in a mediation and reached a settlement with MPD, on July 30, 2020, "that placed her into a management role," *id*., Intro. at 2; *id*. ¶¶ 8–15, as a Records Manager, a job she apparently began on February 28, 2021, *id*, Intro. at 2.[1]  Her claims stem from this latter period of her employment when she had a management role.

After being placed in the management role, plaintiff alleges that she "was subjected to noticeable and impactful disparate treatment."  *Id.* ¶ 16.  As examples of such treatment, plaintiff alleges that she "was required to provide documentation and proof of the need to attend physical therapy for a work related injury, and documentation proving her academic studies, when her male colleagues were not required to do so."  *Id.*  According to plaintiff, her disability "caused

---

[1]    Plaintiff's complaint provides seemingly contradictory timelines about when she applied for promotions, went to mediation, and eventually was promoted.  *See* Compl. ¶¶ 8–14 (stating that MPD's misrepresentations about the department's hiring freeze kept plaintiff out of the Records Manager role from July 2020 to February 2021, but also stating that she only applied for the position leading to the mediation and settlement "on or about February 20, 2021").  Nonetheless, plaintiff apparently was placed into the Records Manager role on February 28, 2021, when MPD implemented the terms of its settlement with plaintiff.  *Id.*, Intro. at 2.

her severe pain and numbness in her hands and forearms" because of the amount of typing that she did and "the physical orientation of her workstation." *Id.* ¶ 17.

According to plaintiff's complaint, she "filed an EEOC charge related to this disparate treatment on or about March 3, 2021 (charge No. 570-2022-0026)," less than a week after she began her new job as Records Manager. *Id.* ¶ 19. This EEOC charge alleged that "she was being treated unfavorably because of her gender, that she was being subjected to a hostile work environment, and that MPD was discriminating against her because of her disability." *Id.*[2] After filing this EEOC charge, plaintiff says that her work environment deteriorated and she "was subjected to near daily insults, bullying, harassment, denigration, frivolous and unfounded investigations, and disparate terms and conditions of employment." *Id.* ¶¶ 21–22.

In scattershot examples without dates, plaintiff alleges instances of hostile treatment and altercations she experienced at the hands of both co-workers and more senior personnel. Several of these examples involve plaintiff's supervisor, Bernadette Green. *See id.* ¶ 21.[3] For example, plaintiff's medical provider recommended that she telework two days per week to relieve stress on her hands and forearms, and although she was approved to do this as a reasonable accommodation, that approval was "*immediately disapproved*" by Ms. Green "within a few hours of the approval," with "[n]o explanation or excuse." *Id.* ¶¶ 23–24 (emphasis in original).

---

[2]        Defendant provides a copy of plaintiff's EEOC charge reflecting her signature on December 20, 2021, that was received on December 20, 2021. Def.'s Mot., Ex. 1, Pl.'s EEOC Charge No. 570-2022-00026, ECF No. 8-1. In general, a court must treat a Rule 12(b)(6) motion as a Rule 56 motion for summary judgment if it considers "matters outside the pleadings." Fed. R. Civ. P. 12(d). This conversion rule is not triggered, however, when a court considers "any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alterations in original accepted and citation omitted). This rule is also not triggered when a court considers documents attached to motions to dismiss that are referred to in the complaint and are central to the plaintiff's claim, even when the documents are produced by the defendant. *See, e.g.*, *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) (finding that "the various letters and materials produced in the course of plaintiff's discharge proceeding . . . fall under this exception and may be considered"), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002).

[3]        Defendant clarifies that this supervisor's name is "Greene." Def.'s Mot. at 3 n.2.

Plaintiff alleges that this denial was motivated because of defendant's "animus towards her." *Id.* ¶ 26.  "Plaintiff was subjected to comments from her supervisors attacking her character and bullying her," allegedly "labeling Plaintiff as a troublemaker and someone unworthy of the common courtesy of a greeting," although plaintiff only mentions Ms. Green by name in her complaint as one of her supervisors. *Id.* ¶ 27.  Among the comments, plaintiff accuses Ms. Green of making are: "negative comments about what Plaintiff was wearing, her appearance and her body," *id.* ¶ 35; she "would scream at Plaintiff or speak to Plaintiff in a harsh and condescending tone, and would model for the other employees that Plaintiff did not need to be treated with respect," *id.* ¶ 36; and "tell[] Plaintiff's co-workers how much money Plaintiff made and what her grade and step was, for the express purposes of undermining Plaintiff's ability to manage her staff," *id.* ¶ 37.

Plaintiff also alleges that Ms. Green refused to input her work hours, which caused her stress that she would not be paid, and required her to "chase down Ms. Green and beg for her time to be input, which Ms. Green would do at the very last minute." *Id.* ¶ 28.  This caused plaintiff's pay to be delayed on at least two occasions. *Id.* ¶ 29.  Ms. Green also allegedly "refused to execute her supervisory responsibilities with respect to Plaintiff," which required plaintiff to talk to the lieutenants when she needed time off or a change in schedule. *Id.* ¶ 30. Additionally, plaintiff "was denied bereavement leave when a family member died" and instead was instructed "she needed to prove the death of the family member, which no other person in her department was ever required to do." *Id.* ¶ 33.

Plaintiff's troubles extended further than her relationship with Ms. Green, however, as she alleges that a co-worker, Monica Campbell, threatened physically to attack her, but "[r]ather than admonishing Ms. Campbell, Defendant attempted to suspend Plaintiff, and only because

4

Plaintiff was represented by legal counsel, did Defendant ultimately decide that disciplinary action was unwise, and instead gave Plaintiff a letter of counseling." *Id.* ¶ 32.  According to plaintiff, no action was ever taken with respect to Ms. Campbell for this incident.  *Id.*  Further, plaintiff alleges that Lieutenant Stephen Amadeo once "detained Plaintiff in the office so that he could scream at, and chastise her in front of others, for completing paperwork in accordance with directions from Ms. Green." *Id.* ¶ 34.

Plaintiff alleges that, in October and November 2022, she complained about this alleged mistreatment to Assistant Chief Morgan Kane, Ms. Simpson, and Chief of Diversity Pamela Smith—without any details about how the complaints were communicated, either orally or in writing, together or individually—but nothing was done.  *Id.* ¶ 40.  Instead, plaintiff alleges that defendant then "manufactured a reason to terminate Plaintiff." *Id.* ¶ 43.  After an anonymous tip that "Plaintiff was 'doing favors' for security officers in the gun registry office," *id.* ¶ 44, plaintiff claims she was investigated and found not to have done anything wrong, "[b]ut rather than close the investigation, Defendant kept the scrutiny on Plaintiff in order to catch her in some transgression," *id.* ¶ 45.  In November 2022, plaintiff was informed that her time and attendance records were being investigated, *id.* ¶ 46, when, according to plaintiff, changing the topic of the open investigation was a violation of MPD's policies, *id.* ¶ 47.

Plaintiff was terminated on or about March 21, 2023, but "no reason was given for her termination letter, and she was never provided any findings with respect to her time and attendance, or given any opportunity to challenge such findings." *Id.* ¶ 49.  Plaintiff claims that because of her race, she was treated more harshly than two colleagues who worked at her same level, including a white male and a Hispanic female, *id.* ¶ 51, and asserts this was part of MPD's pattern and practice of devaluing and discriminating against Black women and women of color,

*id.* ¶ 63.  As support for this assertion, she incorporates racial discrimination allegations made by ten MPD employees who are Black women in another case pending before a different Judge.  *Id.* ¶ 53 (citing *Brinkley v. District of Columbia*, Case No. 1:21-CV-01537).  Alleging that, by 2022, the *Brinkley* case put the Mayor and MPD's Chief on notice that the department's treatment of Black women was inappropriate, *id.* ¶ 54, plaintiff insists that the Mayor and MPD Chief were the driving force behind the retaliation and discrimination to which she was subjected, *id.* ¶¶ 56–57, 64–65.

## B.    Procedural Background

Approximately two months after her termination, plaintiff filed the instant complaint, alleging in ten counts, racial discrimination and retaliation, in violation of 42 U.S.C. §§ 1981, 1983 (Counts I and II), gender discrimination and retaliation, in violation of Title VII and the DCHRA (Counts III–VI), and disability retaliation and failure to accommodate, in violation of the ADA, 42 U.S.C. §§ 126, 12101 *et seq.*, and the DCHRA (Counts VII–X).  *See generally* Compl.  As relief, plaintiff seeks "compensatory damages of not less than $3,000,000.00," as well as "costs, fees, attorney's fees and interest."  *Id.* ¶ 132.

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (citation omitted).  A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability" and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Banneker Ventures, LLC v. Graham*, 798 F.3d

1119, 1129 (D.C. Cir. 2015) ("Plausibility requires more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

In deciding a motion under Rule 12(b)(6), a court must consider the whole complaint, accepting all factual allegations in the complaint as true, even if doubtful in fact, and construing all reasonable inferences in the plaintiff's favor. *Twombly*, 550 U.S. at 555; *see also Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022). A court, however, does not "accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (alterations in original accepted and citation omitted).

### B.    Rule 56

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Hall & Assocs. v. Env't Prot. Agency*, 956 F.3d 621, 629 (D.C. Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *id.* at 323, while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party" (citation omitted)).

In evaluating a motion for summary judgment "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id*. at 651.  Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Mayorga v. Merdon*, 928 F.3d 84, 94 (D.C. Cir. 2019) (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000) (citation omitted)); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295–96 (D.C. Cir. 2015).

## III.    DISCUSSION

Defendant seeks dismissal of all ten of plaintiff's claims, arguing the Complaint fails plausibly to allege that the District has municipal liability as to race discrimination and retaliation, in Counts I and II; that plaintiff suffered an adverse employment action because of her gender, in Counts III and IV; that she suffered a hostile work environment due to her gender and disability, in Counts V through VIII; and that she could perform the necessary functions of her job with a reasonable accommodation, in Count X.  *See generally*, Def.'s Mot.  Further, defendant contends that plaintiff failed administratively to exhaust her remedies before claiming retaliation, under Title VII, due to her gender and disability and failure to accommodate her disability, under the ADA, in Counts V, VII, and IX, requiring dismissal of these claims on this ground alone.  *Id.* at 15–18.  In the alternative, defendant moved for summary judgment as to plaintiff's DCHRA claims in Counts VI and VIII of gender and disability-based retaliation, on the ground that plaintiff failed to prove a causal connection between her protected activity and

any adverse employment action.  *Id.* at 18.  For the following reasons, defendant's motion to dismiss Counts I, II, V, VII, and IX is warranted, and this motion is otherwise denied.

### A.    Claimed Race Discrimination and Retaliation (Counts I and II)

Defendant seeks dismissal of plaintiff's claims, in Counts I and II, that she was subject to race discrimination and retaliation, respectively, in violation of 42 U.S.C. § 1981 and enforced under 42 U.S.C. § 1983, due to failure plausibly to allege municipal liability.[4]

In a Section 1983 suit, alleging violations of constitutional rights by an individual acting under color of state law, the District, as a municipality, "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (emphasis in original).  Thus, the law is well settled that "[l]ocal governments [] are not liable for injuries inflicted solely by their employees or agents; the government must be the 'moving force' behind the violation." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1136 (D.C. Cir. 2023) (quoting *Monell*, 436 U.S. at 694).

To succeed on a Section 1983 claim against a municipality, the plaintiff must show both a predicate violation of some right, privilege, or immunity secured by the Constitution or laws of the United States, *see* 42 U.S.C. § 1983, and "that the municipality's custom or policy caused the violation."  *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 123–24 (1992)).  "While Congress never questioned its power to impose civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others*."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in

---

[4]    Plaintiff asserted no claim of race discrimination and retaliation under Title VII.

original).  "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."  *Id*. (emphasis in original).

Acknowledging this requirement, plaintiff contends that "she can articulate a policy or practice that forms the basis of the discrimination she endured."  Pl.'s Opp'n to Def.'s Mot. to Dismiss or for Partial Summ. J. ("Pl.'s Opp'n") at 6, ECF No. 12.  A plaintiff may establish that a municipality's custom or policy caused the constitutional violation at issue by demonstrating: (1) "the explicit setting of a policy by the government that violates the Constitution," (2) "the action of a policy maker with the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become custom," or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (internal citations and quotation marks omitted).

Plaintiff makes no allegation about an "explicit setting of a policy" violative of the Constitution, instead invoking the names of the District's policymakers and accusing them of "callous indifference" and being the "driving force behind" plaintiff's claimed disparate treatment on the basis of race, *see, e.g.*, Compl. ¶¶ 64–66, 68, and also using language regarding "MPD's custom and practice," *id*. ¶ 63, in an effort to trigger other prongs for municipal liability. Defendant counters that for claims of municipal liability to survive plaintiff "must allege concentrated, fully packed, precisely delineated scenarios as proof that an unconstitutional policy or custom exists" in order to satisfy one of these requirements, Def.'s Mot. at 9 (quoting *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013)) (internal quotation marks omitted), and,

here, plaintiff's allegations are too "conclusory" to establish any unconstitutional municipal policy or custom or deliberate indifference to constitutional violation, *id.* at 9–13.  At most, plaintiff alleges merely isolated instances of alleged disparate treatment by supervisors and co-workers, which are insufficient to impose municipal liability under § 1983, because "[w]ere it otherwise, nearly every act could impute Section 1983 liability to the government," *id.* at 10 (quoting *Hamilton v. District of Columbia*, 720 F. Supp. 2d 102, 113 (D.D.C. 2010)).

To show that her claims brought under § 1983 extend more broadly than just to her, plaintiff alleges that "she has been victimized by MPD's custom and practice of devaluing, denigrating and subjugating Black women and women of color, and she incorporates and references the allegations in *Brinkley*," Compl. ¶ 63, "which over the course of a 200+ page Complaint filed in this Court in 2021, outlines decades of disparate and hostile treatment of African American women at MPD," Pl.'s Opp'n at 8 (emphasis omitted).[5]  Plaintiff further asserts that "Mayor Bowser and Chief Contee, both of whom are ultimate decision makers, were on notice in early 2022 that MPD's personnel policies and practices are seriously out of compliance with EEOC regulations due to an external investigation that so stated, and opted to do nothing about it."  Compl. ¶ 64.

The Supreme Court has interpreted the term "policymaker" in the context of municipal liability narrowly, noting that "when a subordinate's decision is subject to review by the municipality's authorized policymakers," those policymakers "have retained the authority to measure the official's conduct for conformance with *their* policies."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (emphasis in original).  In this Circuit, courts "have held

---

[5]      The *Brinkley* case relied upon by plaintiff was filed by the same plaintiff's counsel as the instant action, and the District's Partial Motion to Dismiss, which is predicated in part on the ground that plaintiffs failed to prove municipal liability, has not been resolved in that case. *See* Def.'s Mot. for Partial Dismissal of Am. Compl. or for Partial Summ. J. at 46–48, *Brinkley v. District of Columbia*, 21-cv-1537, ECF No. 33.

that a final policy maker 'typically must be at least an agency head or the governing body of an agency.'"  *Allen–Brown v. District of Columbia*, 54 F. Supp. 3d 35, 42 (D.D.C. 2014) (quoting *Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 91 (D.D.C. 2011)).  This requirement is in accord with the D.C. Circuit's holding in *Triplett v. District of Columbia*, that "[t]he only acts that count" for *Monell* purposes "are ones by a person or persons who 'have final policymaking authority [under] state law.'" 108 F.3d 1450, 1453 (D.C. Cir. 1997) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)) (alteration in original).

Perhaps recognizing this limit on municipal liability, plaintiff alleges that the Mayor and MPD Chief Contee had ultimate decision-making authority and were the cause of her discrimination.  Compl. ¶ 64.  In the District, the Mayor is ultimately responsible for the police department, *see* D.C. Code § 5–101.03, and the Mayor appoints a Chief of Police, "with the advice and consent of the [City] Council," D.C. Code § 5–105.01(a–1)(1), to administer the police department.  All police officers are required to "respect and obey the Chief of Police as the head and chief of the police force, subject to the rules, regulations, and general orders of the Council of the District of Columbia and the Mayor of the District of Columbia."  D.C. Code § 5–127.03.  Thus, by law, police officers below the level of the Chief of Police are subordinates whose "decision[s are] subject to review by the municipality's authorized policymakers."  *See Praprotnik*, 485 U.S. at 127.

Set against that legal background, the actions alleged to have been taken by Ms. Green, Ms. Simpson, and other MPD employees or supervisors fail to satisfy the prerequisites for municipal liability to sustain a *Monell* claim.  Only plaintiff's conclusory statements implicating Chief Contee and Mayor Bowser can contribute to plaintiff's case in this inquiry.  While plaintiff broadly asserts Mayor Bowser's knowledge of the discriminatory environment at MPD and

adoption of discriminatory policies or customs, plaintiff has offered no specific facts confirming such knowledge or acceptance.  Where, as here, plaintiffs have "not produced any evidence that [the agency's] alleged discriminatory employment practices impacted a single employee" other than his or herself, claims of alleged municipal liability have been rejected.  *Sledge v. District of Columbia*, 63 F. Supp. 3d 1, 28 (D.D.C. 2014) (quoting *DuBerry v. District of Columbia*, 582 F.Supp.2d 27, 39 (D.D.C. 2008)); *see also Bonaccorsy v. District of Columbia*, 685 F. Supp. 2d 18, 26–27 (D.D.C. 2010) (holding that plaintiff failed to establish municipal liability when alleging that MPD violated her First Amendment rights but failing to connect that violation to an unconstitutional policy).  Plaintiff's reliance on unconfirmed allegations in the *Brinkley* case to assert that Mayor Bowser and Chief Contee were aware of allegedly discriminatory practices at MPD are insufficient to save her claim—particularly, since plaintiff has offered no analysis or comparison as to the similarities in position, responsibilities, supervisors, time periods, between this case and that one.  Such mere allegations fall far short of establishing the requisite "adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become custom" as required for municipal liability.  *Baker*, 326 F.3d at 1306 (internal citation and quotation marks omitted); *see also Praprotnik*, 485 U.S. at 130 (noting that "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale. In such circumstances, the purposes of § 1983 would not be served by treating a subordinate employees' decision as if it were a reflection of municipal policy.").

Plaintiff's allegations would also fail on a deliberate indifference theory of municipal liability.  Courts determine whether municipal liability may lie on such a theory "by analyzing

whether the municipality knew or should have known of the risk of constitutional violations, but did not act." *Warren*, 353 F.3d at 39 (internal quotation marks omitted). In other words, "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." *Id*. (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)). Again, plaintiff fails to allege sufficient factual matter to show that the municipality in this case had "actual or constructive knowledge that its agents will probably violate constitutional rights." *Id*. Plaintiff's own conclusory statements and the allegations in the *Brinkley* case are insufficient themselves to establish such actual or constructive knowledge on the part of Mayor Bowser or MPD Chief Contee.

Plaintiff's claims of race discrimination and retaliation against the District are, at bottom, premised on the actions of her supervisors and co-workers, and a theory of *respondeat superior* cannot be the basis of municipal defendant liability under Sections 1981 or 1983. Consequently, Counts I and II of plaintiff's complaint are dismissed.

### B.      Gender Discrimination (Counts III and IV)

Defendant moves to dismiss plaintiff's claims, in Counts III and IV, of gender discrimination, under Title VII and the DCHRA, respectively, for failure plausibly to "allege that she suffered an adverse employment action because of her gender." Def.'s Mot. at 13. Both Title VII and the DCHRA make it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's race and sex. 42 U.S.C. § 2000e-2(a)(1); *accord* D.C. Code § 2-1402.11(a)(1). An employee who has suffered an adverse employment action because of his or gender has been subjected to a violation of both statutes, which are subject to the same analysis. *Mawakana v. Bd. of Trs. of the Univ. of D.C.*, 926 F.3d 859, 863 (D.C. Cir. 2019); s*ee also Brown v. Sessoms*, 774 F.3d 1016, 1024 (2014); *Baloch v. Kempthorne*, 550 F.3d 1191,

1196, (D.C. Cir. 2008); *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 802–03

(D.C. 2003) (noting that Title VII and DCHRA are subject to same analysis).

      To bring a gender discrimination claim under Title VII and the DCHRA, plaintiff must

allege that "(1) she is a member of a protected class (2) she suffered an adverse employment

action and (3) the unfavorable action gives rise to an inference of discrimination." *Russell v.

Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001); *Doe 1 v. George Wash. Univ.*, 369 F. Supp. 3d 49,

84 (D.D.C. 2019).  An adverse employment action constitutes "a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits." *Burlington

Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "While adverse employment actions extend

beyond readily quantifiable losses, not everything that makes an employee unhappy is an

actionable adverse action." *Russell*, 257 F.3d at 818 (quoting *Smart v. Ball State Univ.*, 89 F.3d

437, 441 (7th Cir. 1996)).  For example, "changes in assignments or work-related duties do not

ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or

work hour changes," *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997),

while discriminatory transfers or denial of transfer requests do amount to cognizable harms

under Title VII, *Chambers v. District of Columbia*, 35 F.4th 870, 872 (D.C. Cir. 2022).

      The parties do not dispute that plaintiff is a member of a protected class because she is a

woman.  Defendant challenges the sufficiency of the gender-based discrimination and retaliation

claims solely on the ground that plaintiff "does not plausibly allege that she suffered an adverse

employment action because of her gender." Def.'s Mot. at 13.  The allegations in the complaint

that pertain to plaintiff's gender discrimination claim are thin, and although she contends that

defendant's unlawful conduct ultimately resulted in her termination, her only allegation that

specifically supports gender discrimination is that "unlike her male colleagues, she was required to provide proof and verification of attending physical therapy treatments related to a workplace injury."  Compl. ¶ 91.  Plaintiff asserts that this indicated a discriminatory bias against her "because there was never any allegation or reason to believe that Plaintiff was not attending therapy sessions."  *Id.* ¶ 92.  Plaintiff supplements this claim with an assertion that she was subjected to hyper-scrutiny based on her gender, but hyper-scrutiny does not amount to an adverse employment action.  *Lester v. Natsios*, 290 F. Supp. 2d 11, 27 (D.D.C. 2003).

Plaintiff's complaints of gender discrimination may seem bolstered by her allegations that her supervisor, Ms. Green, refused to input her work hours, which delayed her pay on two occasions, *see* Compl. ¶¶ 28–29, that defendant "attempted to suspend plaintiff" in response to an incident when her female colleague threatened to physically attack her, *id.* ¶¶ 31–32, and that "Ms. Green made negative comments about what Plaintiff was wearing, her appearance and her body," *id.* ¶ 35.  Each of these allegations, however, involves hostile treatment that plaintiff experienced at the hands of other women in her office, and therefore are weak support for any inference that this conduct was a result of gender discrimination against plaintiff because she is a woman.  Plaintiff's claim of gender discrimination is thus thinly supported only by her statements that she was required to provide proof of attending physical therapy class.  Although this barely survives plausibility review, defendant's motion to dismiss the gender discrimination claims in Counts III and IV, under Title VII and the DHCRA, on this basis is thus denied.

### C.   Gender and Disability Retaliation and Failure to Accommodate Violative of Federal Law (Counts V, VII, and IX)

Defendant seeks dismissal of plaintiff's claims, in Counts V, VII, and IX, for gender-based retaliation under Title VII, disability retaliation under the ADA, and failure to accommodate under the ADA, respectively, for failure administratively to exhaust.  Def.'s Mot.

at 15–16.  The ADA and Title VII require that a party exhaust his or her administrative remedies before filing suit.  *Ramos v. Garland*, 77 F.4th 932, 937 (D.C. Cir. 2023) (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) ("Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge)"; *Marshall v. Federal Exp. Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) ("Before bringing suit in federal court, ADA plaintiffs, like those under Title VII, must exhaust their administrative remedies by filing an EEOC charge and giving that agency a chance to act on it.").

Plaintiff concedes that she has not administratively exhausted these three claims, either expressly or by failing to address defendant's arguments.  *See, e.g.*, Pl.'s Opp'n at 13 (agreeing to "voluntarily dismiss[] without prejudice her Title VII retaliation claim," although not clarifying whether this dismissal applies to the gender-retaliation claim in Count V or the disability retaliation claim in Count VII, or both); Def.'s Reply at 7 (highlighting that plaintiff failed to address defendant's arguments "that she has not administratively exhausted her Title VII hostile work environment claim and ADA failure-to-accommodate, retaliation, and hostile work environment claims" in Counts VII and IX); *accord Brown v. Sessoms*, 774 F.3d 1016, 1020 n.3 (D.C. Cir. 2014) (finding wrongful termination claim forfeit for failing to include argument supporting claim).  Plaintiff may not bring suit until "the EEOC has notified the aggrieved person of its decision to dismiss or its inability to bring a civil action within the requisite time period . . . ." *Park*, 71 F.3d at 907.  Defendant's motion to dismiss Counts V, VII, and IX is thus granted, without prejudice.[6]

---

[6]  Defendant also argues that Count V should be dismissed for failure to state a plausible hostile work environment claim, Def.'s Mot. at 18 n.5, but that argument need not be considered given dismissal of this count for failure administratively to exhaust.

### D.     Gender and Disability Retaliation Violative of DCHRA (Counts VI and VIII)

Defendant seeks dismissal for failure to state a claim for relief or, alternatively, summary judgment on plaintiff's gender-based and disability retaliation claims, in violation of the DCHRA, in Counts VI and VIII, respectively.  Def.'s Mot. at 18.  "A prima facie case of retaliation requires that a plaintiff demonstrate she: 1) engaged in a statutorily protected activity; 2) suffered a materially adverse action by her employer; and that 3) a causal connection existed between the two."  *Nurriddin v. Bolden*, 818 F.3d 751, 758 n.6 (D.C. Cir. 2016); *see also Jones*, 557 F.3d at 677.  Although the plaintiff's burden at the prima facie stage "is not great," a plaintiff must still "establish facts adequate to permit an inference of a retaliatory motive."  *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (quoting *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)).

Defendant argues that "there is no temporal proximity between Plaintiff's protected activity and any adverse employment action," because "the first possible adverse employment action that Plaintiff alleges, the disapproval of her telework request," occurred almost one-year after the filing of her EEOC charge, and she "does not provide dates or even a timeframe for the other conduct that she alleges created a hostile work environment."  Def.'s Mot. at 19.  Underscoring this point, defendant cites plaintiff's termination as "the only clear adverse employment action taken against Plaintiff," and that termination occurred in March 2023, fifteen months after plaintiff filed her EEOC charge.  *Id.* at 20.

Plaintiff counters that showing a causal link in a retaliation claim is a "low hurdle," and plaintiff "clears that hurdle by alleging that she is the victim of a continuing and ongoing scheme to push her out of her employment that began because Defendant did not want to promote her into her role in the first place, and manifest an intention to push her out from the very beginning."  Pl.'s Opp'n at 13.  She also reiterates that she "specifically alleges that her

relationship with her supervisor deteriorated immediately after filing the EEOC charge, and that she was subjected to near daily harassment from that point forward." *Id*. at 14.

Though conceding that "there are other ways to demonstrate a causal connection aside from temporal proximity," Def.'s Reply at 8, defendant insists that since plaintiff relied on temporal proximity in her complaint and supposedly "concedes that she has not adequately pleaded temporal proximity" in her opposition, her DCHRA retaliation claims must be dismissed, *id*.  Defendant's argument appears predicated on an improperly narrow reading of plaintiff's complaint.  Both parties acknowledge that "[e]vidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection," *Medina v. District of Columbia*, 517 F. Supp. 2d 272, 288 (D.D.C. 2007), and plaintiff alleges that "[i]mmediately after filing her EEOC charge, Plaintiff was subjected to a hostile work environment," Compl. ¶ 110.  Without specifying the exact timeframe of the hostile work environment experienced, plaintiff's allegations indicate this discriminatory or disparate treatment occurred "in the time period between the protected activity and the adverse employment action." *See Medina*, 517 F. Supp. 2d at 288.  These allegations are exceedingly spare and barely sufficient to establish the causal link between her alleged protected activity and the adverse employment action of termination.  Nevertheless, at this stage, defendant's motion to dismiss, or for summary judgment as to, Counts VI and VIII is denied on this basis.[7]

---

[7]     Defendant moves, in the alternative, for summary judgment as to Counts VI and VIII, Def.'s Mot. at 18, in response to which plaintiff requests that this portion of defendant's motion be held in abeyance until plaintiff has an opportunity for discovery, pursuant to Rule 56(d), *see generally* Pl.'s Discovery Mot.  Defendant's motion for summary judgment is denied and thus plaintiff's discovery motion is denied as moot.

Defendant additionally argues that plaintiff's claims in Counts VI and VIII should be dismissed because she has failed to "state a plausible hostile work environment claim." Def.'s Mot. at 22. The following factors are among those to consider in evaluating whether a plausible hostile work environment claim has been plead: (1) the "frequency of the discriminatory conduct"; (2) the severity of the conduct; (3) whether the conduct is "physically threatening or humiliating, or a mere offensive utterance"; and (4) whether the conduct reasonably interferes with the employee's work performance. *Faragher v. Boca Raton*, 524 U.S. 775, 787–88 (1998). Defendant downplays plaintiff's allegations of a hostile work environment as not rising "to the level of severity and pervasiveness needed to state a plausible hostile work environment claim," and characterizes the allegations as occasional instances of poor treatment, close scrutiny by her supervisor, and only isolated incidents of threats of violence against her. Def.'s Reply at 11–12. Assuming as true the allegations in the complaint, as required, plaintiff alleges a female coworker threatened her with violence but plaintiff was given a letter of counseling, Compl. ¶¶ 31-32; her supervisor occasionally delayed inputting plaintiff's work hours, causing plaintiff stress that she would not get paid, *id.* ¶ 28, attacked her character and bullied her, *id.* ¶ 27, denied her bereavement leave without proof of the death, which proof no other department employee was required to provide, *id.* ¶ 33, and screamed at her in front of others, *id.* ¶ 34. At a minimum, these allegations of persistent verbal belittling and allegedly disparate treatment from others in the department would reasonably interfere with plaintiff's performance. Plaintiff's claims of a hostile work environment due to her gender and disability, in Counts VI and VIII, thus survive defendant's motion to dismiss.

### E.     Failure to Accommodate Under the DCHRA (Count X)

Defendant seeks dismissal of plaintiff's claim, in Count X, regarding defendant's failure to provide a reasonable accommodation for her disability, in violation of the DCHRA, because

plaintiff failed to plead that she could perform the essential functions of her job with reasonable accommodations.  Def.'s Mot. at 21.  "To make out a prima facie case of discrimination for failure to reasonably accommodate [under the ADA], [the] plaintiff must demonstrate by a preponderance of the evidence : (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of her job; and (4) that the employer refused to make such accommodations."  *Floyd v. Lee*, 968 F. Supp. 2d 308, 316 (D.D.C. 2013).

Defendant argues that plaintiff's bare allegation that she is "a qualified person with a disability" is not enough to establish this element of a failure to accommodate claim, Def.'s Mot. at 21, and if this were all that was alleged, defendant would be correct.  Yet, plaintiff does allege more than that she is a qualified person with a disability.  Specifically, she further alleges that she "asked for a reasonable accommodation," that MPD "never asserted . . . that allowing Plaintiff to telework would be hardship to the enterprise," and that "other employees who were not disabled were allowed to telework while Plaintiff was not."  Compl. ¶¶ 123–27.  Although these allegations suggest that plaintiff believes she could perform the essential functions of her job while teleworking from home two times a week, that element of her claim is never explicitly asserted.  Although other employees were allowed to telework, plaintiff does not clarify whether these other employees had the same responsibilities as her and whether her job itself could be completed while working from home two days a week.

Despite these deficiencies in the Complaint, plaintiff also alleges that "Defendant did not engage in an interactive process with Plaintiff to ascertain if telework was a viable accommodation."  *Id.* ¶ 25.  After an employee's initial disclosure, "the ADA obligates the employer to engage with the employee in an interactive process to determine the appropriate

accommodation under the circumstances." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000) (internal quotation marks omitted).  In the interactive process, "neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)).  An employee may establish that an employer violated their right to a reasonable accommodation if the employer refuses to participate in an interactive process or participates in bad faith.  *Ward*, 762 F.3d at 32.  "A party that fails to communicate, by way of initiation or response, may [] be acting in bad faith." *Id.* (quoting *Sears*, 417 F.3d at 805).  Thus, by alleging that defendant failed to participate in an interactive process to determine a reasonable accommodation for her disability, plaintiff has sufficiently alleged her claim of a failure to accommodate.  Defendant's motion to dismiss Count X is thus denied.

## IV.   CONCLUSION

To summarize, defendant's motion to dismiss is granted as to plaintiff's Sections 1981 and 1983, Title VII, and ADA claims in Counts I, II, V, VII, and IX, but is otherwise denied. This case will thus proceed only on plaintiff's claims of gender discrimination and retaliation, under Title VII and the DCHRA, in Counts III, IV, and VI, disability retaliation under the DCHRA, in Count VIII, and failure to accommodate under the DCHRA, in Count X.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date:   March 21, 2024

_____
**BERYL A. HOWELL**
United States District Judge